UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| BRENDA PERRY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )        No. 2:20 CV 118 |
| | ) |
| PORTER HOSPITAL LLC d/b/a | ) |
| PORTER REGIONAL HOSPITAL, | ) |
| LUTHERAN HEALTH NETWORK | ) |
| OF INDIANA d/b/a PORTER | ) |
| HEALTH CARE SYSTEM, | ) |
| | ) |
| Defendants. | ) |

## OPINION and ORDER

This matter is before the court on defendants' motion for summary judgment.

(DE # 29.) For the reasons that follow, defendants' motion is granted.

I.      **BACKGROUND**[1]

This employment discrimination case arises from plaintiff Brenda Perry's

employment with defendant Porter Hospital, LLC d/b/a Porter Regional Hospital and

defendant Lutheran Health Network of Indiana, LLC d/b/a Porter Health Care System.

(DE # 1.)

A.      *Plaintiff's Applications for Employment*

Plaintiff is the single mother of a minor daughter with a disability. (DE # 35-1 at

1.) In October 2018, plaintiff applied for a job as a food service worker with defendants.

---

[1] The following facts are undisputed for purposes of defendants' motion, unless
otherwise noted.

(DE # 35-2 at 1.) Plaintiff withdrew her application in October 2018 and informed

defendants that she was interested in the position of diet clerk. (*Id.*) On October 28,

2018, plaintiff applied for a position as a part-time diet clerk. (DE # 35-1 at 1; DE # 35-2

at 3.)

      B.     *Plaintiff's First Interview*

In November 2018, Paul Savich, the manager of the Food and Nutrition

Department, interviewed plaintiff. (DE # 35-1 at 2; DE # 30-6 at 2.) The parties dispute

which position plaintiff was being considered for during this interview. Plaintiff

believed she was being considered for the diet clerk position. (DE # 35-1 at 2.) Savich

claims he interviewed plaintiff for the food service worker position because he had

already determined that plaintiff did not have the experience required for the diet clerk

position, and declined to interview her for that position. (DE # 30-6 at 3-4.) He claims

that plaintiff was instead contacted to see whether she would be interested in the food

service worker position. (*Id.* at 3.)

During the interview, plaintiff informed Savich that she has a minor child with a

disability. (DE # 35-1 at 2.) Plaintiff claims that she informed Savich that, because of her

caregiving responsibilities, she could not work after 5:00 p.m., and could only work on

weekdays. (*Id.*) Savich, on the other hand, claims he told plaintiff that the food service

worker position was a part-time evening position and plaintiff told him that she could

find a way to work the evening shift. (DE # 30-6 at 4.) The parties agree that Savich told

2

plaintiff that she would not be offered the job because she could not work alternating weekends. (DE # 30-6 at 5; DE # 35-1 at 2.)

C.      *Position Qualifications*

Savich claims that in 2018 and 2019, it was typical for him to fill the diet clerk position internally, from individuals already employed by, and working in, the hospital. (DE # 30-6 at 3.) He claims that he rarely hired external applicants for the diet clerk position, and any external applicant he hired would have to possess significant day-to-day diet clerk experience in another hospital and be intimately familiar with specialized hospital diets. (*Id.*) Savich claims that plaintiff was not qualified for the diet clerk position based on her lack of experience. (*Id.*) The parties dispute whether Savich told plaintiff that she was unqualified for the diet clerk position. (DE # 30-6 at 4; DE # 35-1 at 2.)

The diet clerk job posting listed the following qualifications for external candidates: "High school diploma or GED required. Basic typing and computer skills required. One year food service experience preferred." (DE # 30-2 at 4.) Plaintiff has a high school diploma, four years of food service experience, and basic typing and computer skills. (DE # 35-1 at 2.)

D.      *Position Shifts*

The posting for the food service worker position stated that the applicant must be available to work both evening and day shifts and rotating weekend shifts. (DE # 30-6 at 10.) Savich states that the food service worker position would be primarily an

3

evening shift, with the employee occasionally being required to cover day shifts as needed. (*Id.* at 4.) At the time plaintiff was interviewed by Savich, there were no day shifts available for the food service worker position. (*Id.* at 3.) The position of part-time day-shift food service worker was already filled. (*Id.* at 4.)

The posting for the diet clerk position did not specify which shift it sought to fill. (DE # 30-6 at 15.) According to Savich, the diet clerk position was a part-time position working rotating day and evening shifts. (DE # 30-6 at 3.)

D.     *Plaintiff's Second Interview*

After her first interview, plaintiff arranged to have childcare on alternate weekends and claims that she applied for the diet clerk position for a second time. (DE # 35-1 at 3.) Defendants dispute that plaintiff re-applied for the diet clerk position and instead assert that plaintiff re-applied for the food service worker position. (DE # 30-6 at 5; DE # 35-2 at 9.)

Savich interviewed plaintiff for a second time in December 2018. (DE # 30-6 at 5.) Plaintiff claims that she told defendants that she was only available to work the day shift and alternating weekends. (*Id.*) Savich claims that he told plaintiff that she would be expected to work the evening shift. (DE # 30-6 at 5.)

E.     *Plaintiff's Employment*

In December 2018, defendants offered plaintiff the job of food service worker. (DE # 30-4 at 2.) The offer letter did not say what shift plaintiff would work. (*Id.*) According to plaintiff, defendants gave her no reason to believe that she was not offered

4

the job of part-time day-shift diet clerk. (DE # 35-1 at 3.) Defendants sometime refer to

the diet clerk position as a Food Services Worker II or "Food Svcs Wrk II." (DE # 30-6 at

14.)

After attending orientation, plaintiff was given a work schedule with night shifts.

(DE # 35-1 at 3.) She informed Savich that she was unavailable to work after 5:00 p.m.

(*Id.*) Savich reminded plaintiff that her offer letter stated that her shift and hours were

not guaranteed. (*Id.* at 3-4.)

Plaintiff called Angie Hampton, who plaintiff believed to be the human resources

director. (*Id.* at 4.) Hampton confirmed that plaintiff had applied for the part-time day-

shift diet clerk position and that defendants were to consider plaintiff for the diet clerk

position. (*Id.*)

Plaintiff made a verbal complaint of disability discrimination to defendants'

compliance office. (*Id.*) Plaintiff also made the same complaint to Stephanie Engle, a

human resources employee. (DE # 35-9 at 2.) Plaintiff requested a work schedule that

met her needs for her daughter's care. (*Id.*)

Defendants have a "100% attendance" policy for new employees during their

introductory period. (DE # 35-10 at 1.) Plaintiff did not appear for her scheduled shifts.

(DE # 30-6 at 6.) In January 2019, defendants met with plaintiff and asked her to either

agree to work the night shift or to resign. (*Id.*) Plaintiff refused to resign. (*Id.*) Plaintiff

informed Savich that she would not be appearing for any of her scheduled shifts. (*Id.*)

The parties met for a second time in February 2019. (*Id.* at 7.) Defendants encouraged

plaintiff to resign because she had failed to appear for any scheduled shift. (*Id.*) Plaintiff

did not resign. (DE # 35-1 at 5.) Plaintiff's employment was terminated on February 6,

2019. (DE # 30-8 at 7.)

Plaintiff's complaint alleges that defendants are liable for discrimination and

retaliation under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112 and 42

U.S.C. § 12203; discrimination and retaliation on the basis of her sex and caregiver

status under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(1),

e-3(a); and violating the Genetic Information Nondiscrimination Act (GINA), 42 U.S.C.

§ 2000ff-1. (DE # 1.) In her response brief, plaintiff relinquishes her GINA claim. (DE #

34 at 24.) Accordingly, judgment is summarily granted in favor of defendants as to

Count IV.

Defendants now move for summary judgment on plaintiff's remaining claims.

(DE # 29.) This matter is fully briefed and is ripe for ruling.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 requires the entry of summary judgment, after

adequate time for discovery, against a party "who fails to make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). In responding to a motion for summary judgment, the non-moving party must

identify specific facts establishing that there is a genuine issue of fact for trial. *Anderson

v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Palmer v. Marion County*, 327 F.3d 588, 595

(7th Cir. 2003). In doing so, the non-moving party cannot rest on the pleadings alone, but must present fresh proof in support of its position. *Anderson*, 477 U.S. at 248; *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995).

III.     **DISCUSSION**

A.      *ADA Discrimination Claim*

The parties dispute most of the facts surrounding plaintiff's employment with defendants. This court's task is to determine whether these disputes preclude the entry of summary judgment in defendants' favor. Construing all of the facts in the light most favorable to plaintiff, plaintiff was interviewed for the position of diet clerk and was informed that she would not receive an offer for the job because she was not available to

7

work alternating weekends. She was not told that she was not qualified for the job of diet clerk. After making arrangements to work alternating weekends, she again applied and was interviewed for the diet clerk position. She was not given any reason to believe that she was not hired for the diet clerk position. However, defendants actually hired her for the food service worker position, a position that required evening shifts. Later, she spoke to one of defendants' human resources employees who confirmed that she had applied, and would be considered, for an available day-shift position as a diet clerk. After accepting the job, she learned she would be required to work evening shifts, shifts defendants knew she could not work.

In her discrimination claim, plaintiff argues that defendants intentionally sabotaged her by offering her the night-shift food service worker position, instead of the day-shift diet clerk position, knowing that she could not work the night shift, and then ended her employment when she did not appear for her scheduled shifts. (DE # 34 at 15-16.) Plaintiff argues that a reasonable jury could infer that defendants offered her a job she could not work as a form of discrimination against her based on her association with her disabled daughter.

"Under 42 U.S.C. § 12112(b)(4), an employer is prohibited from discriminating against an employee 'because of the known disability of an individual with whom [the employee] is known to have a relationship or association.' " *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336 (7th Cir. 2012); *see also* 29 C.F.R. § 1630.8. The Seventh Circuit has identified three categories into which "associational discrimination"

plaintiffs generally fall: expense, disability by association, and distraction. *Magnus*, 688

F.3d at 336*; see also Larimer v. Int'l Bus. Machines Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

However, these three categories are not exhaustive. *Pierri v. Medline Indus., Inc.*, 970 F.3d

803, 807 (7th Cir. 2020).

A plaintiff may establish her associational discrimination claim by utilizing a

modified version of the *McDonnell Douglas* test, by establishing: "(1) she was qualified

for the job at the time of the adverse employment action; (2) she was subjected to an

adverse employment action; (3) she was known by her employer at the time to have a

relative or associate with a disability; and (4) her case falls into one of the three relevant

categories of expense, distraction, or association." *Magnus*, 688 F.3d at 336–37.

In this case, plaintiff utilizes the modified version of the *McDonnell Doulgas* test

and claims that she was discriminated against on the basis of all three associational

discrimination categories. (DE # 34 at 14.) Thus, the court will begin with the modified

*McDonell Douglas* analysis. However, the court must ultimately review the totality of

the evidence to determine if a jury could find that defendants took an adverse

employment action against plaintiff on the basis of her association with a disabled

individual. *Monroe*, 871 F.3d at 504; *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th

Cir. 2016).

Plaintiff has either established a *prima facie* case, or else established a question of

fact, as to the first three prongs of the modified *McDonell Douglas* test. First, there is a

question of fact as to whether plaintiff was qualified for the diet clerk position. While

defendants point to Savich's claim that he required external candidates for the diet clerk position to possess significant day-to-day diet clerk experience in another hospital and to be intimately familiar with specialized hospital diets, these qualifications were not identified in the position posting. The posting for external candidates merely states that it is "preferred" that external candidates possess one year of "food service experience." Given the discrepancy between the requirements in the job posting and Savich's claims, a jury could reasonably infer that experience as a diet clerk in another hospital was not a genuine requirement for the diet clerk position. *See e.g. Grigsby v. LaHood*, 628 F.3d 354, 360 (7th Cir. 2010); *Courtney v. Biosound, Inc.*, 42 F.3d 414, 421 (7th Cir. 1994); *Shelton v. Nw. Mem'l Hosp.*, 130 F. Supp. 2d 1001, 1005 (N.D. Ill. 2001); *Barker v. Andrew Corp.*, No. 96 C 1111, 1997 WL 803866, at *6 (N.D. Ill. Dec. 31, 1997).

With regard to the second element of the test, a change to a different position, with a schedule she could not accommodate, might be considered an adverse employment action. As to the third element, it is undisputed that Savich was aware that she had a daughter with a disability. However, plaintiff has failed to establish a question of fact as to the fourth element: that her case falls into the category of distraction, expense, or association.

The "distraction" theory of associational discrimination "contemplates a scenario, for example, where an employee is fired because she is a bit inattentive on the job due to her child's or spouse's disability that requires her attention, but not so inattentive that she needs an accommodation to perform to her employer's

10

satisfaction." *Magnus*, 688 F.3d at 336. "Associational discrimination claims are unlike

those otherwise falling under the ADA because employers are not required to provide

reasonable accommodations to non-disabled workers. Thus, an employee who cannot

meet the attendance requirements of her job is not protected by § 12112(b)(4)." *Id.*

(internal citations omitted). "Although an employer does not have to accommodate an

employee because of her association with a disabled person, the employer cannot

terminate the employee for unfounded assumptions about the need to care for a

disabled person." *Id.* at 337. Here, plaintiff has not identified any evidence to support

her claim that defendants believed she would be distracted by her obligations to her

daughter, or that defendants intentionally sabotaged or terminated her employment

because of such a belief. *See Pierri*, 970 F.3d at 807 ("Pierri has not pointed to any

evidence that he was distracted, that Medline regarded him as distracted, or that

Medline took any action against him in retaliation for any real or imagined

distraction.").

The "expense" variant of an associational discrimination claim "arises when an

employee's relative has a disability that is costly to the employer because the relative is

covered by the company's health plan." *Id.* at 806–07 (cleaned up). Plaintiff argues that

because her daughter was in speech therapy with one of defendants' providers,

defendants knew at least some of the expenses of her daughter's health care, and

therefore a reasonable jury could conclude that the expense of her daughter's care was

an important factor in defendants' employment decisions. (DE # 34 at 15.) Yet, there is

11

no evidence in the record to support an inference that defendants' actions were motivated by the cost of adding plaintiff's daughter to the healthcare plan. In fact, there is no evidence suggesting that Savich or any other decision-maker even knew that plaintiff's daughter was treated by one of defendants' providers.

Finally, " 'disability by association,' occurs when an employer fears that the employee may have become infected with a disease because of the known disease of an associate of the employee." *Pierri*, 970 F.3d at 807. Another example of disability by association would be if "one of the employee's blood relatives has a disabling ailment that has a genetic component and the employee is likely to develop the disability as well (maybe the relative is an identical twin)[.]"*Larimer*, 370 F.3d at 700. There is no evidence in the record to support this theory, nor does plaintiff make more than a cursory argument that this form of discrimination occurred.

Plaintiff argues that, even if defendants had interviewed her for the food service worker position (instead of the diet clerk position), there was an available part-time day-shift food service worker position at the time she applied. (DE # 34 at 11.) Her position appears to be that a jury could infer discriminatory intent based on defendants' refusal to schedule her for the day-shift food service worker position. Yet, there is no evidence that there was an available day-shift food service worker position.

In support of her position, plaintiff points to two statements by defendants' employees. First, she points to Savich's statement that a food service worker could be scheduled for one of "two 'Day' shifts," and from this plaintiff extrapolates that there

must have been two day-shift positions, only one of which was filled. (DE # 34 at 10.) In truth, Savich explained that "[t]he part time Day shift employee, Kathy Wilczynlski, worked either the 6:30 am to 3:00 pm shift or the 7:00 am to 3:30 pm shift." (DE # 30-6 at 3.) No reasonable jury could conclude from this statement that defendants had two day-shift positions, rather than two different shifts from which the one day-shift employee could choose. (DE # 30-6 at 3.) Moreover, Savich explicitly states that there was no available day-shift position for food service workers at the time plaintiff applied. (*Id.*)

Second, plaintiff points to an email from Stephanie Egle, a human resources employee, explaining that plaintiff was told that 95% of new hires work evening shifts. (DE # 35 at 23.) Plaintiff argues that this means that 5% of new hires do not have to work evening shifts. Yet, the fact that some percentage of new hires are hired for day shifts is irrelevant; there is no evidence that any available day-shift food service worker position existed at the time plaintiff was hired. In fact, the full statement from Egle states, "[plaintiff] was then told that we have no other shifts available for her to work and that this is the schedule that 95% of our new hires work when they start." (DE # 35-10 at 1.) Accordingly, there is no evidence supporting plaintiff's claim of an available day-shift food service worker position.

Reviewing the evidence as a whole, plaintiff has no theory of associational discrimination that is supported by the evidence. Defendants may have offered plaintiff a job with a schedule she could not accommodate, but there is no evidence that this decision was motivated by expense, distraction, or association. The fact that plaintiff

13

could not work her assigned shifts because she needed to care for her disabled daughter does not rise to the level of a viable discrimination claim because she was not entitled to a reasonable accommodation. It is undisputed that defendants had a "100% attendance" policy during the employee's introductory period. Plaintiff failed to appear for any of her scheduled shifts. While an employer cannot terminate an employee for unfounded assumptions about the need to care for a disabled person, an employer may terminate that employee for violating a neutral employer policy concerning attendance – even if the reason for the employee's absence is to care for a disabled person. *Magnus*, 688 F.3d at 337. That is precisely what happened here. Plaintiff has failed to put forward a *prima facie* case of associational discrimination under the ADA and therefore defendants are entitled to summary judgment on plaintiff's ADA discrimination claim.

B.    *ADA Retaliation Claim*

Defendants next seek summary judgment on plaintiff's ADA retaliation claim.[2] Plaintiff's retaliation claim is not precluded by the fact that defendants are entitled to summary judgment on plaintiff's underlying discrimination claim. *See Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007).

---

[2] Neither party addresses plaintiff's Title VII retaliation claim in the summary judgment briefing. However, the anti-retaliation provision of the ADA uses similar language to that in Title VII, and is analyzed under the same standard. *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018); *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Accordingly, defendants are entitled to summary judgment on any Title VII retaliation claim for the same reasons articulated in this section.

14

There are two ways a plaintiff may prove a *prima facie* retaliation claim, the direct

method and indirect method. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). To

succeed on a claim for retaliation under the direct method, "a plaintiff must

demonstrate that she engaged in protected activity, that she suffered an adverse action,

and that there is a causal connection between the two. Protected activities include

asserting one's rights under the [Americans with Disabilities] Act either by seeking

accommodation or by raising a claim of discrimination due to disability." *Rodrigo v.

Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018) (internal citation omitted).

In this case, plaintiff has chosen to proceed with the direct method. However,

regardless of which method a plaintiff chooses, the court must ultimately consider the

evidence as a whole to determine whether the evidence would permit a reasonable fact-

finder to conclude that plaintiff's protected activity caused the adverse employment

action. *Rowlands v. United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 801 (7th Cir. 2018).

In her brief, plaintiff appears to argue that the adverse employment action at

issue was defendants' failure to schedule plaintiff for a day-shift position. (*See e.g.* DE #

34 at 20; DE # 1 at 15-16.) Yet, plaintiff's scheduled shift cannot be the basis of her

retaliation claim because she was provided with her night-shift schedule before she

made her complaints that her assignment to a night shift was discriminatory.

To the extent that plaintiff argues that her termination was retaliatory, this

argument must fail. Considering the evidence as a whole, and given plaintiff's failure to

appear for any of her scheduled shifts, no reasonable factfinder could conclude that her

15

termination was motivated by her complaints of discrimination. Accordingly,

defendants are entitled to summary judgment on this claim.

      C.      *Title VII Discrimination Claim*

Plaintiff argues that defendants are liable for sex discrimination under Title VII

under a "sex plus" or "intersectional discrimination" theory. (DE # 34 at 21.) Plaintiff

alleges that defendants discriminated against her because she is a female associated

with a disabled person. In support of this theory, plaintiff relies on cases involving two

different classes protected under Title VII. Yet here, plaintiff's status as the primary

caregiver to a disabled child is not a protected class under Title VII. However, without

deciding the viability of plaintiff's sex-plus argument, defendants are entitled to

summary judgment on plaintiff's Title VII discrimination claim.

At the summary judgment phase in a Title VII action, the court must determine

whether the evidence would permit a reasonable factfinder to conclude that plaintiff's

sex caused an adverse employment action. *See Ortiz*, 834 F.3d at 765; *David v. Bd. of

Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).

In this case there is simply no evidence to support a reasonable inference that

plaintiff's sex caused her to be offered a night-shift position, or that her sex was the

reason for her termination. Accordingly, defendants are entitled to summary judgment

on plaintiff's Title VII claims.

## IV.   CONCLUSION

For these reasons, defendants' motion for summary judgment (DE # 29) is

**GRANTED.** The court directs the Clerk to **ENTER FINAL JUDGMENT** stating:

> Judgment is entered in favor of defendants Lutheran Health Network of
> Indiana, LLC d/b/a Porter Health Care System, and Porter Hospital, LLC
> d/b/a Porter Regional Hospital, and against plaintiff Brenda Perry, who
> shall take nothing by way of the complaint.

Plaintiff's motion for leave to file instanter and substitute the affidavit of Brenda Perry

with marked Exhibits A and B (DE # 36)  is **GRANTED.**

**SO ORDERED.**

Date: October 14, 2022

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT